1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL A. DIAZ, | ) 1:10cv034 DLB |
| | ) |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Paul A. Diaz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his applications on September 7, 2007, alleging disability since January 1, 2005, due to back and arm pain, diabetes, blurred vision, left shoulder problems, high blood

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

pressure, depression and anxiety.  AR 100-106, 107-110, 129-137.  After his applications were denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 69, 70, 85.  ALJ Robert Milton Erickson held a hearing on October 8, 2008, and issued a decision denying benefits on March 25, 2009.  AR 9-17, 22-69.  The Appeals Council denied review on September 19, 2009.  AR 5-7.

Hearing Testimony

ALJ Erickson held a hearing on October 8, 2008, in San Francisco, California.  Plaintiff appeared with his representative, Gioconda Egan.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 22.

Plaintiff testified that he was working as an electrician's assistant in 2000 when he was injured.  AR 29.  After he was injured, he tried to go to vocational school but did not have transportation.  AR 30.  Since January 2005, he has tried to do side jobs but was unable to work. AR 30.

Plaintiff completed the 10th grade.  He dropped out of school because he had to start working.  AR 51.

Plaintiff saw an eye doctor about three weeks ago and received new glasses.  He was also told to see a specialist because of his diabetes.  AR 32.  Plaintiff also testified that he was told he had hepatitis C and was receiving shots to control it.  AR 33.

Plaintiff lives with his father and they help take care of each other.  Plaintiff sometimes helps his father with making lunch or dinner and sometimes helps him with his laundry.  AR 35, 40.  Plaintiff was doing the grocery shopping, but it is hard for him now because he doesn't have transportation.  AR 36.  Plaintiff's car was in an accident in September and he can no longer use it.  For the last month, friends have been picking him up and taking him to the grocery store.  AR 36.  He would sometimes walk to the grocery store, which is half a block away, though it would take him "a little bit."  AR 37.  Plaintiff estimated that it took him about 30 minutes.  AR 38.

Plaintiff has two children, ages 13 and 20, though he does not live with them.  Plaintiff went to some of his son's high school soccer games, but he'd have to leave after 30 to 45 minutes

because of sharp pain.  AR 41.  He was also unable to sit or stand for long during his daughter's eighth grade graduation.  AR 43.

When questioned by his attorney, Plaintiff testified that he could not work because of strain in his neck, left shoulder and arm.  His diabetes also makes him tired, even though he's trying to keep it under control.  AR 45.  Plaintiff also has problems with his back and goes to physical therapy for his "whole left side."  AR 46, 48.  He explained that therapy is soothing, but when he leaves, "it just acts up again."  AR 46.  He has been going twice a week for the past two months.  AR 46.

On a scale of 1 to 10, his average daily pain is often at a 10 in the mornings.  It takes at least 30 to 45 minutes for him to get up and move around.  AR 48.  Other times, the pain is at an 8 or 9.  AR 48.

Plaintiff is able to lift his left hand, but not as high as in the past.  AR 48.  He thought that he could lift five or ten pounds.  He sometimes drops things, like a grocery bag, because he'll get a sharp pain in his arm or cramps in his fingers.  AR 48, 49.  Plaintiff's pain travels all the way down into his fingers and he has to hold a gallon of milk with two hands.  AR 49.  He cannot do any type of repetitive activity and can't even throw a ball anymore because of sharp pain down his left side.  AR 50.

Plaintiff currently takes Vicodin, but he doesn't like to take too much because it makes him tired.  He also takes Neurontin and insulin.  He gets very tired from the medications and just wants to sleep so that he can't feel any pain.  The medication helps a little bit, but not as much as it used to.  The pain interferes with his concentration and sleep.  AR 50, 51.

Plaintiff explained that he also has trouble driving.  Holding the steering wheel gives him pain in his shoulder and neck and it's difficult for him to turn and check his mirrors.  AR 52.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience, who could lift 25 pounds occasionally, 10 pounds frequently, stand for six hours and sit for six hours.  This person could not perform over-shoulder reaching with the left upper extremity.  AR 60-61.  This person could not perform Plaintiff's past work, but the VE testified that this person could perform sedentary unskilled work and 50 percent of the light

3

1  unskilled positions in California.  AR 61.  At the sedentary level, possible positions included
2  ampoule sealer, loader of semi-conductor dyes and stuffer.  AR 62-63.

3       For the second hypothetical, the ALJ asked the VE to assume that this person could lift
4  and carry 20 pounds occasionally, 10 pounds frequently, stand for six hours and sit for six hours.
5  This person could not perform over-shoulder reaching with the left upper extremity and could
6  perform only occasional gross manipulation.  This person could not perform Plaintiff's past
7  relevant work and could not perform any other work because of the gross manipulation
8  limitation.  AR 64-65.

9       For the third hypothetical, the ALJ asked the VE to assume that this person could lift and
10 carry 10 pounds occasionally, up to nine pounds frequently, stand for six hours, but with no
11 standing or walking for more than 20 minutes at a time.  This person could sit for six hours, but
12 could not sit for more than 30 minutes at a time.  This person could not perform over-shoulder
13 reaching with the left upper extremity.  This person could not perform Plaintiff's past relevant
14 work and because of the sit/stand option, could perform one-third of the unskilled sedentary
15 positions.  AR 65-66.

16      If this person had to take a break for five minutes after sitting for 30 minutes, he could not
17 perform any work.  AR 67.

18      <u>Medical Record</u>

19      On January 9, 2003, Plaintiff saw Agreed Medical Examiner Steven D. Feinberg, M.D.,
20 after a work injury on October 24, 2000.  Plaintiff was working as an electrician when he was on
21 a ladder and "suddenly had 277 volts current going through his left arm."  He fell off the ladder
22 and passed out.  Plaintiff received stitches at the emergency room and had six months of physical
23 therapy.  Plaintiff tried to return to light duty six or seven months after the injury but was unable
24 to do so.  He complained of sharp pain in his left shoulder which radiated down to his wrist, as
25 well as numbness, swelling and weakness in his left hand and fingers.  Plaintiff rated his pain at
26 an 8-10 on a scale of 1-10.  He can cook but needs frequent breaks and he does not do any
27 housework.  Plaintiff reported a history of diabetes, hepatitis and hypertension.  AR 187-188.

28

On physical examination, Plaintiff was protective of his left upper extremity and showed various pain behaviors with moaning, groaning, grimacing and moving about slowly.  There was no muscular atrophy and arm measurements were equal.  Grip strength on the left was reduced. Cervical range of motion was limited to 75 percent of flexion and 50 percent of extension with discomfort with range.  Left shoulder range was extremely difficult to assess as he voluntarily moved the shoulder only 50 percent of expected and would not extend much beyond 75 percent of expected.  He also complained "bitterly" on left wrist flexion, though it was full.  Plaintiff had diffuse tenderness in his left shoulder, upper back and upper arm areas.  Sensation was difficult to assess on the left side but he did not have clear hypersensitivity.  Reflexes were +2 at the biceps, brachioradialist and triceps.  Ulnar Tinel's was "very positive" on the left and the ulnar nerve was tender to palpation.  Median Tinel's and Phalen's testing were negative bilaterally. AR 188-189.

Dr. Feinberg diagnosed status-post October 24, 2000, left upper extremity electrical injury, diabetes, hypertension, psychological factors affecting physical condition, left brachial plexus neuropathy and complex regional pain syndrome.  He noted that Plaintiff's presentation was complicated by pain behavior and it was difficult to separate out what is physiologic and what is non-organic.  Dr. Feinberg could not deem Plaintiff permanent and stationary and recommended that Plaintiff be treated by a pain specialist, undergo an MRI and EMG, and explore other treatments and medications.  AR 189-194.

On December 22, 2003, Dr. Feinberg reexamined Plaintiff.  He continued to have sharp pains in his left shoulder radiating all the way down to his wrist, along with numbness and swelling of the left hand and fingers.  His symptoms worsen when he uses the left upper extremity.  Plaintiff also has left mid-back pain and does not sleep well.  On examination, there was no muscular atrophy and grip strength was decreased in the left.  Cervical motion was full but left shoulder range was 75 percent of expected.  Plaintiff had diffuse tenderness in his left shoulder, upper back and upper arm areas.  Sensation was normal.  Reflexes were +2 at the biceps, brachioradials and triceps.  Ulnar Tinel's was "very positive" on the left and the ulnar

nerve was tender to palpation.  Median Tinel's and Phalen's testing were negative bilaterally.
AR 181-184.

Dr. Feinberg diagnosed status-post October 24, 2000, left upper extremity electrical injury, diabetes, hypertension, psychological factors affecting physical condition and left brachial plexus neuropathy versus ulnar serve lesion.  He noted that his prior recommendations for evaluation and treatment were not "commenced."  Unlike his prior examination, Plaintiff did not demonstrate any pain behavior and Dr. Feinberg believed he was permanent and stationary. Plaintiff could not return to his former occupation but was medically appropriate for vocational rehabilitation.  Subjective factors of disability included constant slight to occasional moderate pain.  Objectively, Plaintiff had a 50 percent left grip strength decrement.  He lost half of his left upper extremity for lifting, carrying, pushing, pulling, grasping, gripping or fine manipulation. Plaintiff could not perform forceful repetitive activities.  Future medical care should be left open on a precautionary basis because Plaintiff is still symptomatic.  AR 184-185.

Plaintiff returned to Dr. Feinberg on September 27, 2005.  Plaintiff reported that he had not had medical treatment for his injury in quite some time.  His current symptoms were unchanged and included sharp pain in his left shoulder radiating down to his wrist, as well as numbness and swelling of the left hand and fingers.  He also has left mid-back pain.  Plaintiff's legs were also starting to cramp at night.  AR 197-200.

On examination, Plaintiff again presented with mild pain behaviors with wincing and moaning and moving about slowly.  There was no muscular atrophy.  Grip strength was decreased in the left hand.  Cervical motion was full and left shoulder range was 50 to 75 percent of expected.  Plaintiff had diffuse tenderness in his left shoulder, upper back and upper arm areas. Sensation was normal.  Reflexes were +2 at the biceps, brachioradials and triceps.  Ulnar Tinel's was "very positive" on the left and the ulnar nerve was tender to palpation.  Median Tinel's was negative bilaterally and Phalen's testing was positive on the left.

Electrodiagnostic testing showed evidence of a differential bilateral carpal tunnel syndrome and underlying diabetic neuropathy.  Plaintiff scored within the valid range on two of the three assessments in a pain assessment battery.  Failure to score within the valid range on one

1   assessment may show potential lack of effort, concentration, or investment in the testing process.

2   The results suggest that psychological variables may be affecting his experience of pain and

3   treatment response to a moderate degree.  Dr. Feinberg was particularly concerned about his

4   symptoms of depression, which may have influenced the testing outcome.  The psychologist who

5   reviewed the results felt that consultation with a mental health professional was strongly advised.

6   From a psychological perspective, the probability of a successful outcome form medical

7   treatment was 1.5 on a 5 point scale.  Plaintiff was considered a below average to average

8   candidate for traditional medical treatment of pain.  AR 200-201.

9        Dr. Feinberg explained that his left shoulder MRI demonstrated revealed distal rotator

10  cuff tendinopathy and moderate lateral acromial down slopping with narrowing of the lateral

11  subacromial spaced suspicious for impingement.  Dr. Feinberg also diagnosed status-post

12  October 24, 2000, left upper extremity electrical injury, diabetes with probably neuropathy,

13  hypertension, psychological factors affecting physical condition, left brachial plexus neuropathy

14  versus ulnar nerve lesion, and chronic pain syndrome.   Plaintiff remained permanent and

15  stationary and was medically appropriate for vocational rehabilitation.  Subjectively, Plaintiff

16  complained of constant slight to occasional moderate pain becoming moderate with heavy use of

17  the left upper extremity.  Objectively, Plaintiff showed a 50 percent left grip strength decrement

18  and left shoulder degenerative changes.  Plaintiff also had a one-half loss of use of the left upper

19  extremity and could not perform overhead work.  Future medical care should be left open on a

20  precautionary basis.  Shoulder surgery may be a consideration but behavioral issues may cloud a

21  good outcome.  Dr. Feinberg also noted that psychological testing suggested that a psychiatric

22  evaluation and treatment may be in order.  AR 202-203.

23       Plaintiff was seen in the emergency room on November 2, 2005, for medication refills.

24  Plaintiff complained of some right wrist discomfort, though he was able to rotate, bend and move

25  the wrist without difficulty.  There was some swelling and tenderness to the distal ulnar, though

26  good rotation and grip strength.  There was no parathesias, radiculopathy or traumatic injury to

27  the extremities.  Sensation and pulses were intact.  AR 335-336.

28

On November 16, 2005, Dr. Feinberg indicated that he reviewed medical records and that his opinion remained unchanged. AR 205.

On February 1, 2006, Plaintiff was seen at the Neurology Clinic at San Francisco General Hospital. He complained of shooting neck, shoulder and arm pain for the past five years. Plaintiff had regained some strength and range of motion in his left shoulder. He had physical therapy twice a week but still rated his pain at a 9 out of 10. Plaintiff also reported that his limb is always cold and that he has to wear long sleeves or use heat for relief. He reported numbness in his left hand and arm. Tylenol and Vicodin help but he hasn't taken any for months. Plaintiff was residing in a parole program and going to school at the program. He had used meth in the past but has been sober for seven months. Examination showed motor weakness in the triceps, deltoid and muscles of the arm and diminished sensation to light touch in the left shoulder, arm and hand. Plaintiff was diagnosed with left arm weakness due to pain, with no atrophy. His pain was likely due to a peripheral nerve injury and cervical radiculopathy after electrocution, C5-C7 distribution. Plaintiff was given a prescription for Neurontin and scheduled for an MRI. AR 271-273.

A cervical x-ray taken on February 1, 2006, showed degenerative changes of the cervical spine at C5-6 and C6-7. AR 274.

On February 21, 2006, Plaintiff reported some benefit from the Neurontin. He was instructed to increase the dose. AR 270.

Plaintiff was seen in the emergency room for medication refills on May 15, 2006. He reported a history of diabetes, hypertension and chronic pain in his left shoulder. There are no examination notes, though Gregory Rutledge, M.D., diagnosed diabetes, hypertension and chronic pain syndrome. AR 333.

On May 20, 2006, Plaintiff was seen in the emergency room for chest wall pain. He was in no acute distress and moved all extremities well. An electrocardiogram was normal. AR 327-329.

Plaintiff returned to the emergency room for medication refills on June 19, 2006. On examination, he had no tenderness or spasms in his back. Sciatic notches were non-tender and he

1   was able to walk on heels and toes without difficulty.  Cranial nerves were grossly intact and

2   deep tendon reflexes were symmetric and equal.  Sensation was intact and motor strength was

3   normal.  Plaintiff's gait was normal.  Plaintiff's medications were refilled and he was instructed

4   to follow-up with his primary care physician and to stop coming to the emergency room for

5   refills.  AR 322-324.

6        On June 26, 2006, Plaintiff was seen by Marvin Richards, M.D., at the San Mateo

7   Medical Center.  Plaintiff reported a history of hepatitis C and reported that he was receiving

8   injections.  Dr. Richards thought that the injections were probably immunizations for hepatitis A

9   and B.  Plaintiff had a reactive hepatitis C test in 2002, with negative A and B.  Plaintiff also

10  described problems similar to hypoglycemia.  Dr. Richards found that his diabetes was under fair

11  control with probable bouts of hypoglycemia.  Plaintiff had a history of hepatitis C and was not a

12  candidate for active treatment.  Plaintiff also "apparently" has chronic low-back pain for which

13  he has been taking Neurontin and ibuprofen.  Plaintiff was instructed to return in two weeks.  AR

14  318-321.

15       Plaintiff was seen at the San Mateo Medical Center on June 27, 2006, for a routine

16  Project 90 intake examination.  Plaintiff had been in the program for about 49 days.  He

17  complained of left kidney pain, blurred vision, right upper trapezius pain and bilateral lower

18  extremity pain.  On examination, Plaintiff was in no acute distress.  Examination of his back was

19  unremarkable.  Plaintiff had +2 pedal pulses in his legs and feet and had normal sensation.  His

20  lower extremity pain was likely due to diabetic neuropathy.  Plaintiff reported that Neurontin was

21  not helping and the nurse practitioner added amitriptyline.  AR 314-316.

22       On November 10, 2007, Plaintiff saw Clark Gable, M.D., for a consultive examination.

23  He complained of pain in his left shoulder, arm and hand from electrocution, as well as pain in

24  his legs.  He also reported that he had diabetes and that his eyesight was getting bad.  Plaintiff

25  was taking Vicodin as well as a medication for numbness and tingling caused by diabetes, which

26  he reported was not of much help.  Dr. Gable did not see any vision problems and suspected that

27  Plaintiff probably needed new glasses.  Pulses were strong and equal bilaterally and he had no

28  edema, cyanosis or clubbing in his extremities.  His muscles were well-developed and there was

1    no atrophy.  Plaintiff indicated that he could not rotate his neck to the left more than 30 degrees,

2    but Dr. Gable questioned whether this was credible.  He was tender over the left posterior

3    cervical area, but not significantly.  His grip strength was diminished in both hands but Dr. Gable

4    believed this was due to poor effort.  Plaintiff's gait was somewhat antalgic but when he walked

5    to the restroom afterwards, it was normal.  Plaintiff had some difficulty walking on his heels and

6    toes.  There was mild tenderness in the right paralumbar area and Plaintiff indicated that he could

7    not fully squat.  Deep tendon reflexes were brisk and symmetric and there were no gross motor or

8    sensory changes.  AR 278-279.

9    Dr. Gable diagnosed (1) type II diabetes, control unknown; (2) some visual problems

10   which could be diabetic retinopathy, though he did not give a clear cut history of same and may

11   just need glasses; (3) moderate diabetic neuropathy; (4) alleged electrocution of the left shoulder,

12   with no atrophy and claimed diminished range of motion of the neck and left upper shoulder; (5)

13   hypertension, under satisfactory control; and (6) history of drug abuse and hepatitis C negative.

14   Dr. Gable opined that Plaintiff could sit for unlimited amounts of time and could stand and walk

15   for a total of six hours with usual breaks.  He had no problem with the right upper extremity.  On

16   the left, Plaintiff could lift 10 pounds frequently, and with both hands, he could lift 25 pounds

17   occasionally.  Plaintiff could lift with the left upper extremity to shoulder level.  Dr. Gable did

18   not see a problem with fine finger or hand movements, though x-rays of his left shoulder would

19   be helpful.  AR 279-280.

20   On November 29, 2007, Plaintiff saw Faith Tobias, Ph.D. for a consultive mental health

21   examination.  Plaintiff reported a history of depression since about December 2006, in reaction to

22   physical health problems and stressful life events.  His symptoms included sadness, tearfulness,

23   negative thoughts, social isolation, fluctuating energy level, insomnia and decreased appetite.

24   For the past three weeks, Plaintiff was living in a substance abuse rehabilitation program.  He has

25   difficulty doing household chores, preparing simple meals, shopping and taking public

26   transportation.  During his free time, he does errands, socializes, attends doctor's appointments

27   and takes short walks.  AR 281-282.

28

On mental status examination, Plaintiff was cooperative and appeared to put forth adequate effort.  He demonstrated mildly decreased attention and cooperation.  His speech was slightly mumbled, though this appeared to be due to missing teeth.  Plaintiff could read and write simple sentences, though he made spelling errors.  His general fund of knowledge was slightly decreased.  Plaintiff was able to answer questions requiring abstract thinking and his remote memory was grossly intact.  He worked with a normal pace and demonstrated adequate persistence.  Plaintiff's affect was slightly restricted and his mood was mildly depressed.  Insight and judgment appeared to be adequate.  Dr. Tobias diagnosed adjustment disorder with depressed mood, methamphetamine dependence, early full remission and cocaine dependence, early full remission.  Plaintiff was mildly impaired in his ability to maintain adequate attention/ concentration, withstand the stress of a routine work day and maintain emotional stability/predictability.  He could manage his funds, though because of his history of substance abuse, he is likely to require assistance to manage funds in his own best interest.  AR 282-284.

On December 5, 2007, State Agency physician Edward S. Gallagher, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Gallagher opined that Plaintiff could occasionally lift 50 pounds, 25 pounds frequently, stand and/or walk for about six hours and sit for about six hours.  Plaintiff had no further limitations.  Dr. Gallagher noted Plaintiff's "very inconsistent" history, effort and cooperation.  He also noted that Plaintiff's allegations "far exceed the objective findings and accumulated objective evidence of record."  AR 285-290.

On January 25, 2008, State Agency physician George Norbeck, M.D., completed a Psychiatric Review Technique form.  Dr. Norbeck opined that Plaintiff's mental impairments, i.e., adjustment disorder with depressed mood and substance abuse disorder, were not severe.  He had no functional limitations.  AR 292-302.

On June 4, 2008, State Agency physician Shashi Mathur, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Mathur opined that Plaintiff could occasionally lift 20 pounds, 10 pounds frequently, stand and/or walk for about six hours and sit for about six hours. Plaintiff was limited in his ability to push and pull with his upper extremities.  He was

1   limited to occasional overhead reaching and occasional gross and fine manipulation.  AR 342-346.

2        On July 9, 2008, Linda Spangler, M.D., completed a "Medical Report General

3   Assistance" and indicated that Plaintiff had chronic degenerative disc disease and right arm

4   radiculopathy.  Dr. Spangler last saw Plaintiff on June 17, 2008.  She opined that he was

5   temporarily incapacitated from June 17, 2008, through December 17, 2008, and could not work.

6   AR 348, 363.

7        Plaintiff attended physical therapy in August and September 2008.  He mostly reported

8   that his shoulder felt better but that his neck was hurting a lot.  Plaintiff did not attend his last

9   session.  AR 349, 353, 355.

10       An eye exam on September 12, 2008, revealed 20/20 vision in each eye with glasses.  AR

11  351.

12  ALJ's Findings

13       The ALJ determined that Plaintiff had the severe impairments of status-post electrocution

14  with limited left shoulder motion and type II diabetes.  AR 16.  Despite these impairments,

15  Plaintiff retained the residual functional capacity ("RFC") to lift and carry 25 pounds

16  occasionally, 10 pounds frequently, with no overhead lifting, and stand, walk or sit for six hours.

17  AR 16.  Plaintiff could not perform his past relevant work, but could perform a significant

18  number of jobs in the national economy.  AR 17.

19                          **SCOPE OF REVIEW**

20       Congress has provided a limited scope of judicial review of the Commissioner's decision

21  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

22  the Court must determine whether the decision of the Commissioner is supported by substantial

23  evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

24  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

25  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

26  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

27  401.  The record as a whole must be considered, weighing both the evidence that supports and

28  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

                                    12

1  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

2  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

3  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

4  Commissioner applied the proper legal standards, and if the Commissioner's findings are

5  supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d

6  509, 510 (9th Cir. 1987).

7  ## REVIEW

8  　　　In order to qualify for benefits, a claimant must establish that she is unable to engage in

9  substantial gainful activity due to a medically determinable physical or mental impairment which

10  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

11  U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of

12  such severity that she is not only unable to do her previous work, but cannot, considering her age,

13  education, and work experience, engage in any other kind of substantial gainful work which

14  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

15  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

16  Cir. 1990).

17  　　　In an effort to achieve uniformity of decisions, the Commissioner has promulgated

18  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

19  C.F.R. §§ 404.1520 (a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1)

20  had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an

21  impairment or a combination of impairments that is considered "severe" (status-post

22  electrocution with limited left shoulder motion and type II diabetes) based on the requirements in

23  the Regulations (20 CFR §§ 404.1520(c), 416.920(c)); (3) does not have an impairment or

24  combination of impairments which meets or equals one of the impairments set forth in Appendix

25  1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) can perform

26  jobs that exist in significant numbers in the national economy.  AR 16-17.

27

28

1     Here, Plaintiff argues that the ALJ erred by (1) improperly analyzing the medical

2 evidence; (2) ignoring evidence of a disabling condition; (3) rejecting Plaintiff's testimony; and

3 (4) failing to meet the burden of identifying other work.

4             **DISCUSSION**

5 A.   Analysis of Medical Opinions

6     Plaintiff first argues that the ALJ failed to provide sufficient reasons to reject Dr.

7 Spangler's July 2008 opinion that Plaintiff could not work.  He also contends that the ALJ did

8 not explain why he rejected Dr. Feinberg's opinions.

9     The opinions of treating doctors should be given more weight than the opinions of

10 doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998);

11 *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not

12 contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

13 supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating

14 doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

15 providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*

16 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out

17 a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

18 interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th

19 Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

20 interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

21 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must be given

22 controlling weight if it is well-supported and not inconsistent with the other substantial evidence

23 in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

24     In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and

25 expounded upon its position regarding the ALJ's acceptance of the opinion an examining

26 physician over that of a treating physician.  "When an examining physician relies on the same

27 clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

28 of the examining physician are not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray,* 722

F.2d at 501-502.  "By contrast, when an examining physician provides 'independent clinical

findings that differ from the findings of the treating physicians, such findings are 'substantial

evidence.'" Orn, 496 F.3d at 632; Miller v. Heckler, 770 F.2d 845, 849 (9th Cir.1985).

Independent clinical findings can be either (1) diagnoses that differ from those offered by another

physician and that are supported by substantial evidence, see Allen v. Heckler, 749 F.2d 577, 579

(9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not

herself considered, see Andrews, 53 F.3d at 1041.

       If a treating physician's opinion is not giving controlling weight because it is not well

supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

in determining what weight to accord the opinion of the treating physician.  Those factors include

the "[l]ength of the treatment relationship and the frequency of examination" by the treating

physician; and the "nature and extent of the treatment relationship" between the patient and the

treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of

the opinion, consistency with the record as a whole, the specialization of the physician, and the

extent to which the physician is familiar with disability programs and evidentiary requirements.

20 C.F.R. § 404.1527(d)(3)-(6).  Even when contradicted by an opinion of an examining

physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to

deference."  SSR 96-2p; Orn, 495 F.3d at 632-633.  "In many cases, a treating source's medical

opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

test for controlling weight."  SSR 96-2p; Orn, 495 F.3d at 633.

       Here, the ALJ was presented with opinions from numerous sources.  Plaintiff's treating

physician, Dr. Spangler, opined in July 2008 that Plaintiff could not work.  Dr. Feinberg, who

saw Plaintiff three times during the course of his worker's compensation action, opined in

September 2005 that Plaintiff had lost 50 percent of his left grip strength and 50 percent of the

use of his left upper extremity.  He also opined that Plaintiff could not perform overhead work.

Consultive examiner Dr. Gable opined that Plaintiff could sit without restriction, stand and/or

walk for six hours and lift, to shoulder level, 10 pounds frequently, 25 pounds occasionally, with

his left upper extremity.  Finally, one State Agency physician found Plaintiff capable of medium

work with no further restrictions and another found him capable of light work with left upper

extremity restrictions in pushing, pulling, overhead reaching and fine manipulation.

The ALJ ultimately adopted the opinion of Dr. Gable in finding that Plaintiff retained the

RFC to lift/carry 10 pounds frequently, 25 pounds occasionally, with no above shoulder reaching,

and stand/walk or sit for six hours.  AR 16.  He therefore rejected the opinion of the treating

physician in favor of the opinion of the examining physician.

*Dr. Spangler's Opinion*

In adopting Dr. Gable's opinion, the ALJ first noted that Dr. Spangler's opinion that

Plaintiff was "unemployable" was neither controlling nor persuasive.  AR 15.  "Conclusory

opinions by medical experts regarding the ultimate question of disability are not binding on the

ALJ."  *Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985).

The ALJ also explained that the "weight of the substantial evidence of record" did not

support Dr. Spangler's finding and gave numerous examples.  AR 15.  First, despite the

electrocution injury, Plaintiff's left shoulder repeatedly showed no muscle atrophy.  AR 15.

Second, although 2006 x-rays revealed degenerative changes in the cervical spine, neck motion

was full during an examination just a few months prior.  AR 15.  Third, other than "moderate

diabetic neuropathy," no diabetic or hypertensive complications are documented and Plaintiff's

vision has remained normal with correction.  AR 15.

Earlier in the decision, during the discussion of Dr. Spangler's opinion, the ALJ also

noted that Dr. Spangler did not set forth any new objective abnormalities.  AR 14.  The ALJ

explained that neither Dr. Gable nor Dr. Feinberg found that Plaintiff could not work, and Dr.

Spangler did not set forth any new objective evidence to support her contention.  Indeed, Dr.

Spangler's opinion consisted simply of her belief that Plaintiff could not work, her diagnoses of

degenerative changes in the cervical spine and right arm radiculopathy, and the date of her last

examination of Plaintiff.  AR 13-14, 348.  While it is true that there is no requirement for the

treating source to provide "new" evidence, the ALJ's citation to the lack of new evidence simply

highlighted the unsupported nature of her opinion.  A lack of supporting clinical findings is a

1   valid reason for rejecting a treating physician's opinion.  *Magallenes v. Bowen*, 881 F.2d 747,

2   751 (9th Cir. 1989).    The ALJ further noted that less than a month and a half after Dr.

3   Spangler's opinion, Plaintiff began reporting improvement in his left shoulder.[2]  AR 14.

4          Plaintiff rejects the ALJ's analysis of the evidence and suggests that the record supports

5   Dr. Spangler's opinion.  He cites Dr. Feinberg's objective findings and his functional limitations.

6   Plaintiff's own interpretation of the evidence does not render the ALJ's findings improper,

7   however.  Indeed, Dr. Spangler provided few, if any, objective findings to support her opinion, so

8   it is unclear the findings upon which her opinion is based.  Moreover, Dr. Feinberg concluded

9   that, despite his objective findings, Plaintiff was eligible for vocational rehabilitation.

10  *Magallanes,* 881 F.2d at 750 (the Court must uphold the ALJ's decision where the evidence is

11  susceptible to more than one rational interpretation).

12         Finally, the ALJ cites the contradictory opinions of the State Agency physicians.

13  Although the ALJ cannot rely on a non-examining physician's opinion alone to reject a treating

14  source opinion, it may be cited in conjunction with other evidence.  Here, in addition to citing the

15  State Agency physician's opinion, the ALJ cited the unsupported nature of Dr. Spangler's

16  opinion and the wealth of contradictory medical evidence.  *E.g., Magallanes v. Bowen,* 881 F.2d

17  747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th

18  Cir.1995).

19         Insofar as Plaintiff contends that Dr. Gable's opinion was faulty because he did not

20  review Plaintiff's medical records other than a single visit to the Mission Neighborhood Health

21  Center, his argument fails.  A consultive examiner's opinion is not based on a review of the

22  medical records, but rather is based on the examiner's own independent clinical findings.  *Orn v.*

23  *Astrue,* 495 F.3d 625 (9th Cir. 2007).  Similarly, although Dr. Gable noted that x-rays would be

24  helpful, his opinion is not rendered any less valid as it was based on his examination findings.

25

26

27  _____

28         [2] The Court notes that Dr. Spangler references Plaintiff's right arm, even though Plaintiff mainly
    complained of his left shoulder and arm.  There are also few complaints of right arm issues.

*Dr. Feinberg's Opinion*

Plaintiff argues that the ALJ erred by failing to provide any reasons for rejecting Dr. Feinberg's opinion and RFC assessment. He is incorrect.

The ALJ thoroughly summarizes Dr. Feinberg's examinations and conclusions. AR 13-14. During his discussion of Dr. Feinberg's findings, the ALJ notes that two of his examinations were complicated by Plaintiff's "pain behaviors." AR 13. He also noted numerous normal findings. For example, Plaintiff's neurological examination was normal at his first visit and during his 2005 visit, Plaintiff had no muscle atrophy, normal sensation and full cervical spine motion. AR 13. The ALJ also cites Plaintiff's admission during the 2005 examination that he was not receiving any medical treatment for his problem. AR 13.

From this discussion, then, it is apparent that the ALJ rejected Dr. Feinberg's arm limitations based on Plaintiff's pain behaviors, the normal objective findings and Plaintiff's own admission that he was not under medical care. *Magallanes,* 881 F.2d at 755 (ALJ need not specifically say "I reject the treating physician's opinions because ..." so long as the record reveals specific, legitimate inferences that may be drawn to justify the decision).

The ALJ's treatment of the medical evidence was supported by substantial evidence and free of legal error.

B.    <u>Complex Regional Pain Syndrome</u>

Next, Plaintiff argues that the ALJ ignored the diagnosis of complex regional pain syndrome and chronic pain syndrome. He contends that these are disabling conditions with resulting limitations that should have been included in the RFC analysis.

In January 2003, prior to Plaintiff's alleged onset date, Dr. Feinberg diagnosed complex regional pain syndrome. AR 192. In September 2005, Dr. Feinberg diagnosed chronic pain syndrome. AR 202. Dr. Rutledge, during one of Plaintiff's emergency room trips in 2006, diagnosed chronic pain syndrome. AR 333.

Here, Plaintiff simply cites a single diagnosis of chronic regional pain syndrome, made two years *prior* to the alleged onset date, and concludes that the ALJ erred by failing to include related pain and functional limitations. The mere diagnosis of an impairment, however, is not

1  sufficient to sustain a finding of disability.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir.

2  1993) (mere existence of impairment is insufficient proof of disability); *Key v. Heckler*, 754 F.2d

3  1545, 1549 (9th Cir. 1985).

4        Moreover, Dr. Rutledge's diagnosis was made during an emergency room visit for

5  medical refills and no examination was performed.  AR 333.

6        Plaintiff's argument it without merit.

7  C.    Plaintiff's Credibility

8        Plaintiff contends that the ALJ failed to set forth sufficient reasons for rejecting his

9  subjective testimony.

10        In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

11  pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's

12  subjective complaints:

13            An ALJ is not "required to believe every allegation of disabling pain" or other
          non-exertional impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).
14        However, to discredit a claimant's testimony when a medical impairment has been
          established, the ALJ must provide "'specific, cogent reasons for the disbelief.'"  *Morgan*,
15        169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why
          the [claimant's] testimony is unpersuasive."  *Id.*  Where, as here, the ALJ did not find
16        "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the
          claimant's testimony must be clear and convincing."  *Id.*

17

18            Social Security Administration rulings specify the proper bases for rejection of a
          claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be
19        supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at
          57860 ("Although Social Security Rulings do not have the same force and effect as the
20        statute or regulations, they are binding on all components of the Social Security
          Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see
21        Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at
          step three of the disability determination was contrary to agency regulations and rulings
22        and therefore warranted remand).  Factors that an ALJ may consider in weighing a
          claimant's credibility include reputation for truthfulness, inconsistencies in testimony or
23        between testimony and conduct, daily activities, and "unexplained, or inadequately
          explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair*,
          885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

24        The ALJ began his credibility analysis by first noting that although Plaintiff complained

25  of shoulder problems since the 2000 electrocution, he received no treatment for several years

26  thereafter.  AR 15.  Indeed, when Plaintiff saw Dr. Feinberg in January 2003, he indicated that he

27  had not been under any medical care for his arm "for quite some time," though he continued to

28

receive follow-up treatment for his diabetes.  AR 183, 193.  From Plaintiff's reports, it appears

he last received treatment for his arm in January 2002.  AR 193.  When Plaintiff was re-

examined by Dr. Feinberg in December 2003, Plaintiff indicated that he did not follow the

recommendations made in January 2003.  AR 183.  Similarly, when Dr. Feinberg reexamined

Plaintiff in September 2005, Plaintiff again reported that he had not had medical treatment for his

work injury in "quite some time."  AR 200.  Therefore, based on his reports to Dr. Feinberg and

the lack of any medical records for this time period, it appears that from January 2002 through

February 2006, Plaintiff received no treatment for his left arm other than the three examinations

by Agreed Medical Examiner Dr. Feinberg.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir.

2005) (ALJ is permitted to consider lack of medical treatment in assessing credibility).

However, the ALJ should not have relied on this lack of treatment without first allowing

Plaintiff an opportunity to explain.  In *Orn v. Astrue*, the Ninth Circuit recognized its prior

holding that "'unexplained, or inadequately explained, failure to seek treatment' may be the basis

for an adverse credibility finding unless one of a 'number of good reasons for not doing so'

applies."  *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007); SSR 96-7p ("adjudicator must not

draw any inferences about an individual's symptoms and their functional effects from a failure to

seek or pursue regular medical treatment without first considering any explanations that the

individual may provide, or other information in the case record, that may explain infrequent or

irregular medical visits or failure to seek medical treatment. . .").  Without questioning Plaintiff

about his gap in medical treatment, the ALJ could not determine whether an exception to the

general rule applied.  For this reason, the ALJ's inference from Plaintiff's lack of medical

treatment was unsupported.  The Court will discuss why this error does not impact the overall

analysis at the conclusion of this discussion.

The ALJ next noted the contrast between Plaintiff's complaints and the medical evidence.

For example, although Plaintiff testified that he had severe restrictions in the use of his left arm,

repeated examinations showed no atrophy.  AR 15.  The ALJ also noted that in 2005, his

symptoms were characterized as "constant slight to occasional moderate pain becoming moderate

with heavy use of the left upper extremity."  AR 202-203.  Plaintiff also reported improvement

1 │ numerous times in 2008.  AR 349, 353, 355.  Contrary to Plaintiff's suggestion, objective

2 │ medical evidence may be cited in a credibility determination where, as here, it is not the only

3 │ reasons relied upon.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  Insofar as Plaintiff

4 │ contends that complex regional pain syndrome is the root of his pain, the Court dismissed this

5 │ argument above.

6 │       In addition to the above evidence, the ALJ noted the indications of "pain behaviors" and

7 │ "less than full cooperation" during physical examinations.  AR 15.  During Dr. Feinberg's

8 │ January 2003 examination, Plaintiff was protective of his left upper extremity and showed

9 │ various pain behavior with moaning, groaning, grimacing and moving about slowly.  Dr.

10 │ Feinberg concluded that his presentation was complicated by pain behavior and it was difficult to

11 │ separate out what was physiologic and what is non-organic.  AR 188-194.  During Dr. Feinberg's

12 │ September 2005 examination, Plaintiff again demonstrated mild pain behaviors "with wincing

13 │ and moaning and moving about slowly."  AR 200.  Given his overall presentation, Dr. Feinberg

14 │ decided to administer a Pain Assessment Battery.  Plaintiff failed to score within the valid range

15 │ on one of three tests.  This "may represent potential lack of effort, concentration, or investment in

16 │ the testing process."  AR 201.

17 │       While Plaintiff is correct that Dr. Feinberg also believed that Plaintiff's depression could

18 │ have affected the testing outcome, the ALJ was entitled to weigh the evidence and draw a

19 │ conclusion.  The evidence also included Dr. Gable's 2007 examination, where Dr. Gable

20 │ questioned Plaintiff's claim that he could only move his neck to 30 degrees.  Dr. Gable also

21 │ believed that Plaintiff put forth poor effort on grip strength testing.  AR 279.  Finally, although

22 │ Plaintiff walked with a somewhat antalgic gait during the examination, Dr. Gable noted that his

23 │ gait was normal when he walked to the restroom after the examination.  AR 279.  The ALJ may

24 │ use "ordinary techniques" in addressing credibility.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792

25 │ (9th Cir. 1997), and may make inferences "logically flowing from the evidence."  *Macri v.*

26 │ *Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

27 │       As to Plaintiff's testimony alleging severe medication side effects, the ALJ explained that

28 │ his allegations were not supported by the documentary evidence.  AR 15.  For example, Plaintiff

1   testified that he gets very tired from the medications and just wants to sleep so that he can't feel

2   any pain.  AR 50.  Despite his testimony, there are no indications in the record that he raised

3   these allegedly severe side effects to his health care providers.  Again, the ALJ is permitted to

4   examine the medical record to see if it supports a claimant's allegations as part of the credibility

5   analysis.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  Plaintiff claims that the ALJ erred

6   by not identifying "which side effects were not corroborated," yet Plaintiff only testified that the

7   medications make him very tired.  Plaintiff also contends that drowsiness and tiredness are not

8   unusual side effects, but this doesn't alter the fact that Plaintiff's allegations were not supported

9   by the record.

10          Finally, the ALJ examined the inconsistencies in Plaintiff's testimony.  First, he explained

11  that although Plaintiff testified that his symptoms increased after a September 2008 car accident,

12  he admitted that prior to that date, he could walk to the grocery store to shop and do his own

13  laundry.  AR 15, 37, 40.  Plaintiff argues that these abilities do not translate into his abilities in a

14  work setting, and while this may be true, it does not prevent the ALJ from examining his

15  testimony to determine if he is more functional than he alleges.  *See eg.*, *Valentine v. Comm'r*

16  *Soc. Secy.*, 574 F.3d 685, 693 (9th Cir. 2009) ("The ALJ recognized that this evidence did not

17  suggest Valentine could return to his old job at Cummins, but she thought it did suggest that

18  Valentine's later claims about the severity of his limitations were exaggerated.")

19          Similarly, the ALJ cited Plaintiff's inconsistent testimony regarding his ability to drive.

20  He explained that although Plaintiff initially testified that he was completely unable to drive, he

21  later stated that he had difficulty with neck pain and with grasping the steering wheel when

22  driving.  AR 15.  The Court agrees with Plaintiff that his testimony wasn't necessarily

23  conflicting, though it was confusing at the very least.  Plaintiff first explained that it was hard for

24  him to drive because he did not "have transportation" after his car was in an accident.  AR 36-37.

25  In other words, Plaintiff's initial reason for having difficulty driving was that he did not have a

26  car, rather than because of his alleged symptoms.  When later directly asked by his attorney,

27  Plaintiff indicated that he had trouble holding the steering wheel because he was left handed and

28  it caused pain in his shoulder and neck.  AR 52.

1    In any event, even if the ALJ misconstrued Plaintiff's testimony, it does not affect the

2    overall credibility determination.  The ALJ also erred, as discussed above, in questioning

3    Plaintiff based on his lack of treatment.  However, in light of the ALJ's citation to the lack of

4    objective medical evidence, Plaintiff's exaggerated behavior and his testimonial inconsistencies,

5    the remaining credibility analysis was supported by substantial evidence.  *Batson v. Barnhart,*

6    *359 F.3d 1190, 1197 (9th Cir. 2004)* ("However, in light of all the other reasons given by the ALJ

7    for Batson's lack of credibility and his residual functional capacity, and in light of the objective

8    medical evidence on which the ALJ relied, there was substantial evidence supporting the ALJ's

9    decision.").

10   D.   Identification of Other Work

11       Finally, Plaintiff argues that the ALJ failed to meet his burden at step five by identifying

12   other work he could perform.

13       At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the

14   claimant, given his or her residual functional capacity, would be able to do; and (2) the

15   availability of such jobs in the national economy.  *Tackett v. Apfel,* 180 F.3d 1094 (9th Cir.

16   1999).  At the hearing, the ALJ poses hypothetical questions to the vocational expert that set out

17   all of the claimant's impairments for the vocational expert's consideration.  *Id.*  (internal citations

18   omitted).  The ALJ's depiction of the claimant's disability must be accurate, detailed, and

19   supported by the medical record.  The vocational expert then  "'translates [these] factual

20   scenarios into realistic job market probabilities' by testifying on the record to what kinds of jobs

21   the claimant still can perform and whether there is a sufficient number of those jobs available in

22   the claimant's region or in several other regions of the economy to support a finding of 'not

23   disabled.'" *Id.* (citing *Desrosiers v. Secy. Health and Human Serv.*, 846 F.2d 573, 578 (9th Cir.

24   1988).

25       Insofar as Plaintiff argues that the ALJ's hypothetical to the VE was incomplete, the

26   Court has rejected the arguments that would have resulted in an insufficient hypothetical.  His

27   argument is therefore without merit.

28

1    Plaintiff also contends that the ALJ failed to identify alternate jobs at step five.  In his

2    decision, the ALJ determined that Plaintiff could perform a significant number of jobs in the

3    national economy, at both the light and sedentary level "and consistent with the vocational expert

4    testimony."  AR 16.  "Where the testimony of a VE is used at Step Five, the VE must identify a

5    specific job or jobs in the national economy having requirements that the claimant's physical and

6    mental abilities and vocational qualifications would satisfy."  *Osenbrock v. Apfel*, 240 F.3d 1157,

7    1162-1163 (9th Cir.2001).  Although the VE set forth three positions during his testimony, the

8    ALJ did not reproduce these positions in his decision.

9    The ALJ's failure to do so, however, is not necessarily where the error lies.  Plaintiff also

10   contends that the three positions identified by the VE require either constant or frequent reaching,

11   and that the ALJ failed to properly resolve this conflict.  Plaintiff cites the *Selected*

12   *Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, a

13   publication upon which the Secretary routinely relies.  *Terry v. Sullivan*, 903 F.2d 1273, 1276

14   (9th Cir. 1990).  Indeed, both ampoule sealer, DOT 559.687.014, and stuffer, DOT 731.685-014,

15   require frequent reaching.  Loader of semi-conductor dies, DOT 726.687.030, requires constant

16   reaching.  Even though the hypothetical was limited to overhead reaching, "it is not clear. . .

17   whether the DOT's requirements include reaching above shoulder level, and this is exactly the

18   sort of inconsistency the ALJ should have resolved with the expert's help." *Prochaska v.*

19   *Barnhart*, 454 F.3d 731 (7th Cir.2006); *Mkhitaryan v. Astrue*, 2010 WL 1752162, at *3

20   (C.D.Cal.2010) ("As defined in the [Selected Characteristics of Occupations Defined in the

21   Revised Dictionary of Occupational Titles], the plain meaning of 'reaching' encompasses

22   above-the-shoulder reaching.").

23   Under these circumstances, the ALJ is required to determine whether a conflict exists

24   and, if so, "whether the vocational expert's explanation for the conflict is reasonable and whether

25   a basis exists for relying on the expert rather than the Dictionary of Occupational Titles."

26   *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007); *see also Johnson v. Shalala*, 60 F.3d

27   1428, 1435 (9th Cir. 1995) (stating that an ALJ may rely on expert testimony which contradicts

28   the DOT "only insofar as the record contains persuasive evidence to support the deviation").

24

Here, although the ALJ reminded the VE to explain how his answers diverge from the DOT prior to posing the hypothetical questions, he did not specifically ask whether any conflicts existed. Therefore, the record does not contain any explanation for the deviation in reaching requirements and the Court cannot determine whether the ALJ properly relied on the VE's testimony.

Additionally, the reaching limitation in the hypothetical posed to the VE is not as restrictive as the limitation included in the RFC. The adopted hypothetical asked the VE to assume a person who could not reach above the shoulder with the left upper extremity. AR 60. The RFC, however, included a limitation to "no above the shoulder reaching." AR 15. Although this may have been an unintentional error, when combined with the unexplained conflict above, the Court cannot conclude that the step five finding was supported by substantial evidence or free of legal error.

E.   Remand

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

Here, the Court finds that the step five error can be remedied with further proceedings. On remand, the ALJ should first ensure that the RFC and hypothetical include the same limitations. The ALJ should also elicit testimony from the VE to determine whether a conflict

1  exists and whether a reasonable basis exists for reconciling the conflict.  *See Massachi*, 486 F.3d

2  at 1153-1154 & n. 19 (vacating in part with instructions to remand where "we have an apparent

3  conflict with no basis for the vocational expert's deviation," and therefore the court "cannot

4  determine whether the ALJ properly relied on [the VE's] testimony" at step five); *Prochaska*,

5  454 F.3d at 736 (reversing and remanding to permit the ALJ to resolve a "potential

6  inconsistency" between the VE's testimony and the DOT where the claimant could not reach

7  above shoulder level, and therefore it was not clear whether she could perform the job of cashier

8  as defined by the DOT).

## CONCLUSION

10     Based on the foregoing, the Court finds that the ALJ's decision is not supported by

11  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

12  further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

13  judgment in favor of Plaintiff Paul A. Diaz and against Defendant Michael J. Astrue,

14  Commissioner of Social Security.

15     IT IS SO ORDERED.

16  **Dated:    April 6, 2011**              **/s/ Dennis L. Beck**

17                         UNITED STATES MAGISTRATE JUDGE